UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ROBERT WAYNE MOONEY, JR.                           CIVIL ACTION

VERSUS                                                      No. 12-969

W&T OFFSHORE, INC., ET AL.                              SECTION I

### ORDER AND REASONS

Before the Court is a motion[1] for partial summary judgment filed by defendant, W&T

Offshore, Inc.  Plaintiff, Robert Wayne Mooney, Jr., opposes the motion.[2] For the following

reasons, the motion for partial summary judgment is **GRANTED.**

### *BACKGROUND*

Plaintiff, Robert Wayne Mooney, Jr. ("Mooney"), alleges that he was injured while

employed by defendant, Offshore Services of Acadiana, LLC ("Offshore Services"), as a Jones

Act seaman on the MATTERHORN SEASTAR.[3]  The MATTERHORN SEASTAR is a tension

leg platform owned and operated by defendant, W&T Offshore, Inc. ("W&T"), at Mississippi

Canyon Block 243 in the Gulf of Mexico.[4]  According to the complaint, Mooney was bitten by a

brown recluse spider while onboard the MATTERHORN SEASTAR.[5]  Mooney claims that the

---

[1] R. Doc. No. 20.

[2] R. Doc. No. 24

[3] R. Doc. No. 1.  Mooney alleges that this Court has admiralty jurisdiction over his *in rem* claims against the MATTERHORN SEASTAR pursuant to 28 U.S.C. § 1333.  Mooney alleges that this Court has subject matter jurisdiction for those claims asserted *in personam* against the remaining defendants pursuant to 46 U.S.C. § 30104 (the "Jones Act") and, alternatively, 33 U.S.C. § 905(b).  Mooney further alleges that if he is found not to be a seaman, defendants remain liable under 33 U.S.C. § 905(b) pursuant to the dual capacity doctrine.  R. Doc. No. 1, at ¶ I.

[4] *Id.* at ¶¶ II-III.

[5] *Id.* at ¶ VIII.

spider bite was misdiagnosed as a boil and improperly treated by "Dr./EMT/ Healthcare Provider 'Dr. Mike Doe,'" which resulted in complications and serious injuries.[6]  Mooney seeks damages resulting from his injury.[7]  Mooney also seeks damages for the alleged failure by "the defendant's agent" to "properly investigate and honor plaintiff's claims for maintenance and/or cure, for arbitrary, capricious, willful, and unreasonable reasons."[8]

W&T filed this motion for partial summary judgment seeking dismissal of any claims predicated on the alleged vessel status of the MATTERHORN SEASTAR.[9]  W&T contends that because the MATTERHORN SEASTAR is not a vessel, this Court should dismiss with prejudice any claims against W&T and *in rem* claims against the MATTERHORN SEASTAR for: (1) alleged negligence under the Jones Act, the general maritime law, or alternatively under the "vessel negligence" provisions of the Longshore and Harbor Workers' Compensation Act ("LHWCA"); (2) the alleged unseaworthiness of the MATTERHORN SEASTAR; (3) the alleged failure to pay maintenance and cure; (4)  the recovery of punitive damages emanating from the alleged failure to pay maintenance and cure; and (5) the recovery of attorney's fees for the alleged failure to pay maintenance and cure.[10]  W&T further requests that this Court find that the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331, *et seq*., adopts the law of Louisiana as the applicable federal law for Mooney's claims against W&T.[11]  Mooney responds

---

[6] *Id.*

[7] *Id.* at ¶ IX.

[8] *Id.* at ¶ X.

[9] R. Doc. No. 20.

[10] *Id.*

[11] *Id.*

that the motion should be denied on the ground that the MATTERHORN SEASTAR is a vessel as a matter of law or, alternatively, on the ground that disputed factual issues preclude summary judgment.

### STANDARD OF LAW

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, the court determines there is no genuine issue of material fact. *See* Fed. R. Civ. P. 56. The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case. *Id.* at 323; *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986).

Once the party seeking summary judgment carries its burden pursuant to Rule 56, the other party must come forward with specific facts showing that there is a genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The party responding to the motion for summary judgment may not rest upon the pleadings, but must identify specific facts that establish a genuine issue. *Id.* The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255; *see Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

### DISCUSSION

The only disputed question raised in connection with this motion for partial summary judgment is whether the MATTERHORN SEASTAR is a "vessel" for the purposes of the Jones Act and the LHWCA. The Rules of Construction Act provides that "[t]he word 'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water."[12] 1 U.S.C. § 3. In *Stewart v. Dutra Construction Co.*, 543 U.S. 481, 497, 125 S. Ct. 1118, 160 L. Ed. 2d 932 (2005), the U.S. Supreme Court held that the definition of "vessel" set forth in § 3 includes "any watercraft practically capable of maritime transportation, regardless of its primary purpose or state of transit at a particular moment." Although § 3 does not require that a watercraft be used primarily for maritime transportation or that the watercraft be in motion to qualify as a vessel, the statutory phrase "capable of being used . . . as a means of transportation on water" requires "practical" possibilities, not merely "theoretical" ones. *Id.* at 496. "[A] watercraft is not 'capable of being used' for maritime transport in any meaningful sense if it has been permanently moored or otherwise rendered practically incapable of transportation or movement." *Id.* at 494.

---

[12] The Rules of Construction Act provides the applicable definition of the term "vessel" for purposes of both the Jones Act and the LHWCA. *See Holmes v. Atl. Sounding Co.*, 437 F.3d 441, 445 (5th Cir. 2006) (citing *Stewart v. Dutra Construction Co.*, 543 U.S. 481, 125 S. Ct. 1118, 160 L. Ed. 2d 932 (2005)).

The Supreme Court applied these principles in *Stewart* when considering whether a massive dredge known as the SUPER SCOOP qualified as a vessel for the purposes of the LHWCA.  The Court noted that the SUPER SCOOP had limited means of self-propulsion, but that it was able to move short distances and it did so every few hours by manipulating its anchors and cables.  The structure also had "a captain and crew, navigational lights, ballast tanks, and a crew dining area." *Id.* at 484.  Although maritime transportation was not the primary purpose of the SUPER SCOOP and the structure was not in navigation at the time of the incident, the Court held that § 3 does not require such findings to afford vessel status.  Because the SUPER SCOOP was engaged in maritime transportation while traversing the Boston Harbor with equipment and workers, the Court held that the SUPER SCOOP fell within the meaning of a "vessel" for the purposes of the LHWCA.

The Supreme Court recently offered additional guidance for courts to consider in "borderline cases where 'capacity' to transport over water is in doubt."  *Lozman v. City of Riviera Beach, Florida*, --- U.S. ---, 133 S. Ct. 735, 740, 745 (Jan. 15, 2013).  In *Lozman*, the Court held that "a structure does not fall within the scope of this statutory phrase unless a reasonable observer, looking to the [structure's] physical characteristics and activities, would consider it designed to a practical degree for carrying people or things over water."  *Id.* at 741. The Court applied this criterion to a floating "house-like plywood structure with French doors on three sides." *Id.* at 739.  The Court held that this structure did not qualify as a vessel for the following reasons:

> But for the fact that it floats, nothing about Lozman's home suggests that it was designed to any practical degree to transport persons or things over water. It had no rudder or other steering mechanism. Its hull was unraked, and it had a rectangular bottom

10 inches below the water. It had no special capacity to generate or store electricity but could obtain that utility only through ongoing connections with the land. Its small rooms looked like ordinary nonmaritime living quarters. And those inside those rooms looked out upon the world, not through watertight portholes, but through French doors or ordinary windows.

Although lack of self-propulsion is not dispositive, it may be a relevant physical characteristic. And Lozman's home differs significantly from an ordinary houseboat in that it has no ability to propel itself. Lozman's home was able to travel over water only by being towed. Prior to its arrest, that home's travel by tow over water took place on only four occasions over a period of seven years. And when the home was towed a significant distance in 2006, the towing company had a second boat follow behind to prevent the home from swinging dangerously from side to side.

The home has no other feature that might suggest a design to transport over water anything other than its own furnishings and related personal effects. In a word, we can find nothing about the home that could lead a reasonable observer to consider it designed to a practical degree for "transportation on water."

*Id.* at 741 (citations omitted).

The Court noted that its focus on the structure's practical capability to transport persons or things over water was supported by "the bulk of precedent," including its previous decisions in *Evansville & Bowling Green Packet Co. v. Chero Cola Bottling Co.*, 271 U.S. 19, 46 S. Ct. 379, 70 L. Ed. 805 (1926) and *Stewart.* The Court explained that in *Evansville*, the Court held that a wharfboat did not qualify as vessel because it "was not used to carry freight from one place to another, nor did it encounter perils of navigation to which craft used for transportation are exposed." *Id.* at 742 (quoting *Evansville*, 271 U.S. at 22) (quotation marks omitted). In contrast, the massive dredge at issue in *Stewart* fell within the definition of a "vessel" because it had characteristics of "more traditional 'seagoing vessels,'" and although it could navigate only by

6

"manipulating its anchors and cables or by being towed," the dredge "did move . . . every couple of hours."   *Id.* (quoting *Stewart*, 543 U.S. at 485) (quotation marks omitted).   The Court explained that "[t]he basic difference" between the structures at issue in *Evansville* and *Stewart* was that "the dredge was regularly, but not primarily, used (and designed in part to be used) to transport workers and equipment over water while the wharfboat was not designed (to any practical degree) to serve a transportation function and did not do so."   *Id.*   at 743.

As one court noted, the Supreme Court's decision in *Lozman* "sent a shot across the bow" of those lower courts whose "opinions [could] be read as endorsing the 'anything that floats' approach" to determining vessel status. *See Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, No. 10-1653, 2013 WL 311084, at *3 (S.D.N.Y. Jan. 25, 2013); *Lozman*, 133 S. Ct. at 743. In *Lozman*, the Supreme Court cited the U.S. Court of Appeals for the Fifth Circuit's decision in *Holmes v. Atlantic Sounding Co.*, 437 F.3d 441 (5th Cir. 2006) as an example of a decision that could be read as endorsing an approach which is "inappropriate and inconsistent with [its] precedents."[13]   *Lozman*, 133 S. Ct. at 743.

Even after *Holmes*, however, the Fifth Circuit declined the opportunity to afford vessel status to a floating production platform that had been permanently moored to the Outer Continental Shelf.  Specifically, in *Mendez v. Anadarko Petroleum Corp.*, 466 Fed. Appx. 316 (5th Cir. Mar. 26, 2012) (unpublished), the Fifth Circuit considered whether to afford vessel status to the RED HAWK spar, a floating gas-production platform moored in water 5,000 feet

---

[13] In *Holmes*, the Fifth Circuit held that a floating dormitory qualified as a vessel under the *Stewart* test while noting that *Stewart* had "significantly enlarged the set of unconventional watercraft that are vessels under the Jones Act and the LHWCA."  *Holmes*, 437 F.3d at 447-49.

deep approximately 210 miles from Sabine Pass, Texas.  Applying the *Stewart* test, the Fifth

Circuit held that the structure did not qualify as a vessel for the following reasons:

> Although the spar floats, it is permanently moored by six mooring
> lines that are attached to 18–foot anchors deeply embedded into the
> sea floor under 5,000 feet of water. The mooring lines are 78 feet
> long. Steel flow lines and export pipelines further attach the spar to
> extraction points in one direction and to an onshore production
> facility in Louisiana, by way of another platform, in another
> direction. The RED HAWK spar is permanently affixed to the sea
> floor and can only be moved after detaching the substantial
> moorings and pipelines that have been joined to its structure. The
> relocation study shows that moving the spar would involve
> detaching all the moorings and severing the pipelines; would take
> nearly two months; would cost of $42 million [sic]; and would
> require abandoning the mooring system and building a new
> mooring system at the new site. The relocation study shows at
> most that the RED HAWK is theoretically capable of maritime
> transportation but not practically capable.

*Mendez*, 466 Fed. Appx. at 318-19.

The Fifth Circuit noted that the RED HAWK made a strong case for non-vessel status

based on the "sensible" rule approved by the Supreme Court in *Stewart* that "ships . . . do not

remain vessels merely because of the remote possibility that they may one day sail again."  *Id.* at

319 (quoting *Stewart*, 543 U.S. at 494).  The Fifth Circuit compared the RED HAWK to floating

casinos which do not qualify as vessels after they are "moored to the shore in a semi-permanent

or indefinite manner." *See Mendez*, 466 Fed. Appx. at 319 (quoting *Pavone v. Miss. Riverboat

Amusement Corp.*, 52 F.3d 560, 570 (5th Cir. 1995) (cited with approval in *Stewart*, 543 U.S. at

494)).  The Fifth Circuit explained:

> With 50 days and $42 million dollars, one could undoubtedly
> disconnect the electrical, water, telephone, and other hookups that
> attach a casino boat to the shore, allowing it to move on water.  *See*
> [*Pavone*] (acknowledging that all that was necessary to disconnect
> the casino boat from the shore was "removing the steel pins from

8

> the ramps [that connected the casino boat to the pier] and letting
> loose all lines and cables"). Disconnecting the RED HAWK from
> the sea floor would make disconnecting a casino boat from the
> shore look as easy as unplugging a toaster.

*Mendez*, 466 Fed. Appx. at 318-19.   As a result, the Fifth Circuit concluded that the RED

HAWK did not qualify as a vessel because it "embodies the distinction between theoretical

capability, which it has, and practical capability, which it does not." *Id*.

Based on the reasoning set forth in *Stewart*, *Lozman*, and *Mendez*, it is clear that the

MATTERHORN SEASTAR does not qualify as a vessel.  Todd Murphy ("Murphy"), a facilities

engineer at W&T's office in Houston, Texas, attests that the MATTERHORN SEASTAR has

been positioned in the Mississippi Canyon Area, Block 243 ("MC 243") in the Gulf of Mexico

on the Outer Continental Shelf off the coast of Louisiana since August 2003.[14]  Murphy attests

that the MATTERHORN SEASTAR is permanently attached to the subsoil and seabed of the

Outer Continental Shelf by six 32-inch diameter neutrally buoyant steel tubes ("tendons").[15]

Two tendons are connected to the end of each of the three pontoons of the MATTERHORN

SEASTAR.[16]   Each tendon connects the MATTERHORN SEASTAR to a corresponding 96-

inch, 100-ton piling driven into the seabed and floor of the Outer Continental Shelf.[17]   Each

piling penetrates the seabed by 395 feet.[18]   The structure is also connected to the Outer

---

[14] R. Doc. 20-3, at ¶ 5.  Mr. Murphy attests that he has been a facilities engineer at W&T's office in Houston, Texas for the past five years.  He states that he has personal knowledge of the construction, characteristics, function, use and future use of the MATTERHORN SEASTAR. *Id.* at ¶ 4.

[15] *Id.* at ¶ 10.

[16] *Id.*

[17] *Id.*

[18] *Id.*

Continental Shelf by an eight-inch diameter oil export pipeline, a ten-inch diameter gas export pipeline, and seven casing production risers that extend from the structure's deck down into the seafloor.[19]  The MATTERHORN SEASTAR generally remains at a nominal position over seven previously drilled wells where it produces oil and gas from the wells, processes and separates the oil and gas, and then transports the oil and gas to Louisiana via two connected export pipelines.[20] Murphy attests that the MATTERHORN SEASTAR has no system of self-propulsion, no raked bow, is not intended to be towed or moved (with the exception of its positioning in the MC243 and its ultimate removal at the end of the life of the reservoirs it serves), and has not been moved since it was installed and anchored to the sea floor.[21]  Murphy further states that the MATTERHORN SEASTAR will remain in its current location for the productive life of its reservoirs and any future tie back wells through 2020, or even as late as 2025.[22]  Murphy states that several months of planning and work would be required in order to move the MATTERHORN SEASTAR.[23]

Mooney does not dispute the facts set forth in the affidavit provided by Murphy, and he offers no evidence of his own to contradict the statements contained therein.  The unrebutted evidence submitted by W&T firmly establishes that the capability of this structure to be used in

---

[19] *Id.* at ¶¶ 11-12.

[20] *Id.* at ¶ 4. Specifically, Murphy states that the maximum lateral movement of the MATTERHORN SEASTAR is approximately 212 feet in the event of a 100 year return period hurricane.  *Id.* at ¶ 13.  Murphy further states that to work over the existing wells, the structure does not move.  *Id.*  Rather, the drilling rig located on the topsides of the structures positioned over individual well slots by skidding that drilling rig over the appropriate well.  *Id.*

[21] *Id.* at ¶ 18.

[22] *Id.* at ¶ 6.

[23] *Id.* at ¶ 15.  Murphy lists several examples of major undertakings that would be required to deconstruct and relocate the structure outside of its permanently anchored position.  *See id.* at ¶¶ 15a-j.

maritime transportation is nothing more than a "theoretical possibility" and that no reasonable observer would consider such a structure "designed to a practical degree for carrying people or things over water." *See Lozman*, 133 S. Ct. at 741; *Stewart*, 543 U.S. at 494, 496. This conclusion is supported by the Fifth Circuit's analysis in *Mendez* as well as numerous post-*Stewart* decisions of the U.S. District Courts considering whether analogous structures qualified as vessels. *See e.g.*, *Moore v. Bis Salamis, Inc.*, 748 F. Supp. 2d 598 (E.D. Tex. 2010) (Crone, J.) (holding that a large floating offshore oil production platform known as the "Thunder Horse" was not a vessel.); *Washington v. BP Am., Inc.*, No. 10-1486, 2012 WL 5831800 (W.D. La. Nov. 16, 2012) (Hill, Mag. J.) (same); *Rushing v. Pride Intern., Inc.*, No. 11-0294, 2011 WL 3021043 (S.D. Tex. July 22, 2011) (Atlas, J.) (same); *Scroggs v. Bis Salamis, Inc.*, No. 09-1007, 2010 WL 3910563 (E.D. Tex. Oct. 5, 2010) (Crone, J.) (same); *Abram v. Nabors Offshore Corp.*, No. 09-4091, 2010 WL 3433056 (S.D. Tex. Aug. 5, 2010) (Harmon, J.) (holding that the "Hoover Diana" tension leg platform was not a vessel).[24] Accordingly, W&T is entitled to summary judgment with respect to Mooney's claims predicated on the vessel status of the MATTERHORN SEASTAR. Any remaining claims are governed by the Outer Continental

---

[24] Mooney relies entirely on a preliminary determination regarding the vessel status of the "Ursa" tension leg platform set forth in *Jordan v. Shell Oil Co.*, No. 06-265, 2007 WL 128313 (S.D. Tex. Jan. 10, 2007) (Kent, J.). However, the district court in *Jordan* later rejected its preliminary determination regarding vessel status and found, after trial, that the "Ursa" tension leg platform did not qualify as a vessel. *See Jordan v. Shell Oil Co.*, No. 06-265, 2007 WL 2220986 (S.D. Tex. Aug. 2, 2007) (Kent, J.).

In *Moore*, the court noted that it was "aware that the court in *Jordan* carried the issue of URSA's vessel status to trial before making its determination [because] '[t]he pre-trial Record was still permeated with factual nuances regarding URSA's design that would cause reasonable minds applying the *Stewart* definition to differ.'" *See Moore*, 748 F. Supp. 2d at 606 n.4. The court in *Moore* held that there was no such impediment to granting summary judgment because the relevant facts were available in the record and not disputed by the parties. *See id.* The undisputed facts in this case are similarly sufficient for the purposes of granting W&T's motion for summary judgment.

Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1333, *et seq.*, which provides this Court with subject matter jurisdiction. *See, e.g., Moore*, 748 F. Supp. 2d at 608-09.[25]

***CONCLUSION***

For the foregoing reasons,

**IT IS ORDERED** that the motion for summary judgment is **GRANTED**. Mooney's claims against W&T and *in rem* claims against the MATTERHORN SEASTAR are **DISMISSED WITH PREJUDICE** to the extent that they are predicated on (1) alleged negligence under the Jones Act, the general maritime law, or alternatively under the "vessel negligence" provisions of the LHWCA; (2) the alleged unseaworthiness of the MATTERHORN SEASTAR; (3) the alleged failure to pay maintenance and cure; (4)  the recovery of punitive damages emanating from the alleged failure to pay maintenance and cure; and (5) the recovery of attorney's fees for the alleged failure to pay maintenance and cure.

**IT IS FURTHER ORDERED** that Mooney's remaining claims are governed by the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331, *et seq.*, including the substantive law of Louisiana, the adjacent state to MC 243 and the MATTERHORN SEASTAR.

New Orleans, Louisiana, March 6, 2013.

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**

---

[25] Mooney does not contest W&T's assertions that, if the MATTERHORN SEASTAR is not a vessel, then his only viable claims against W&T arise under the OCSLA, and that OCSLA mandates the application of Louisiana law.